ACCEPTED
06-14-00162-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
1/26/2015 9:45:16 PM
DEBBIE AUTREY
CLERK

## NO. 06 – 14 – 00162 – CR

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
1/26/2015 9:45:16 PM
DEBBIE AUTREY
~~Clerk~~

IN THE SIXTH DISTRICT COURT OF APPEALS
TEXARKANA, TEXAS

**DENETRA HARRIS**
**Appellant,**

**v.**

**THE STATE OF TEXAS**
**Appellee**

On appeal from County Court at Law Number One, Gregg County, Texas
Trial Court Case No. 2014-0382

## BRIEF OF THE STATE OF TEXAS

**– ORAL ARGUMENT REQUESTED IF GRANTED TO APPELLANT–**

**CARL DORROUGH**
Criminal District Attorney

Zan Colson Brown
Texas Bar No. 03205900
Assistant Criminal District Attorney
Gregg County, Texas
101 East Methvin St., Suite 333
Longview, Texas  75601
Telephone: (903) 236–8440
Facsimile:  (903) 236–3701
Email:zan.brown@co.gregg.tx.us

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ...................................................................................3

STATEMENT REGARDING ORAL ARGUMENT ...........................................4

STATEMENT OF FACTS ....................................................................................5

**SUMMARY OF THE ARGUMENT ............................................................ 8**

The search of the vehicle ARGUMENT ............................................................9

1.  The search of the vehicle was based on the burnt
     marijuana that Trooper Player smelled at first contact;
     the inventory of the vehicle was based on the fact that
     it was going to be towed.................................................................................9

     A.    *Legal Standard* .................................................................................9

     A.    *Application of Law to this Case* ...................................................10

2.  The search and inventory were both justified.................................................13

     A.    *Did the State prove that DPS had a policy and the
     trooper followed the policy regarding the opening of
     containers?* .................................................................................................13

     B.    *Did the trooper begin the inventory before he decided
     to impound the car?* ...................................................................................13

3.  Did the Trial Court abuse her discretion by conditioning
     the bond on the defendant's paying $40 per month for
     her court-appointed attorney?......................................................................18

A.  This issue alleging an abuse of discretion in ordering
     attorney-fee payments has never been brought to the
     attention of the court, and therefore was not
     preserved. ..................................................................................................19

B.  The Code of Criminal Procedure allows a court to pay in
     installments an amount intended to offset the cost to
     the county for attorney's fees.......................................................................20

4.  Was Denetra Harris indigent at the time she requested the
     Court to pay for appellate counsel and the reporter's
     record? ........................................................................................................22

**PRAYER ....................................................................................................... 26**

CERTIFICATE OF SERVICE .......................................................................27

CERTIFICATE OF COMPLIANCE.............................................................28

# INDEX OF AUTHORITIES

## Federal Cases

*Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485
(2009) .................................................................................................. 10

*United States v. Ross* 456 U.S. 798 820-821, 102 S Ct 2157, 72
L.Ed. 2d 572 (1993) ........................................................................ 10,11

## State Cases

Ex parte Anderer, 61 S.W.3d 398 (Tex. Crim. App. 2001) .................... 21, 22

*Gray v. Robinson*, 744 S.W.2d 604 (Tex. Crim. App. 1988) ....................... 25

*McFatridge v. State,* 309 S.W.3d 1 (Tex. Crim. App. 2010) ........... 23, 24, 25

*Ramadan v. State*, 89 S.W.3d 744 (Tex. App.—Houston [1st
Dist.] 2002, no pet.) ............................................................................ 23

*Snoke v. State*, 780 S.W.2d 210 (Tex. Crim. App. 1989) ............................ 23

*Speth v. State*, 939 S.W.2d 769(Tex. App.—Houston [14th Dist.]
1997, no pet.), ..................................................................................... 21

*Whitehead v. State,* 130 S.W.3d 866 (Tex. Crim. App. 2004) ............... 24, 25

## State Statutes

Tex. Crim. Proc. Code Ann. art. 1.051(b) (Vernon) .................................... 24

Tex. Crim. Proc. Code Ann. art. 26.04(l) ................................................... 25

Tex. Crim. Proc. Code Ann. art. 26.04(m) (Vernon) .................................. 25

Tex. Crim. Proc. Code Ann. art. 26.05(g) (Vernon) ................................... 21

## State Rules

Appellate Procedure, Rule 9 (2012) ............................................................ 29

Tex. R. App. P. 20.2 .................................................................................... 24

## STATEMENT REGARDING ORAL ARGUMENT

The State does not recognize any of Appellant's issues as being of first impression, and believes the briefs and record should suffice to form the bases of this Court's decision. Only if Appellant's request for oral argument were to be granted would the State request to be able to respond in kind.

# STATEMENT OF FACTS

Denetra Harris was charged with possessing a controlled substance. CR 5. On January 11, 2014, she was stopped by Trooper Mike Player for a brake light infraction. SX 1 at 1:43; 2 RR 7, 9-10. His intent at that time was to warn her, not to give her a ticket. SX 1 at 2:51. He also asked her at the beginning whether that was her car, and she said yes.SX1 at 2:59. When she could not produce a driver's license or insurance, Player asked her to have a seat in the front passenger seat of his car and she complied. SX 1at 4:45; 2 RR 17at 12-23. She was not handcuffed then.

Trooper Player, while she was seated in the car, very early in their conversation, was contemplating a search, because he asked her about things he would or would not find when he looked inside the car. SX 1 at 8:20. He asked her again if she owned the car when the dispatcher told him the car was registered to someone else. She said she had recently bought the car. SX1 at 6:19, 9:12- 10:10.

Encouraging her to be honest with him, he asked her about marijuana and paraphernalia that might be in her car because he had smelled it. SX 1 6:17-7:10.

He gave her a preliminary breath test. SX1 at 10:55.

When dispatch told him she had two warrants and Dre had none, he informs dispatch that the two warrants need to be sent to the jail. SX1at 12:25 -13:02. He promptly walked around the car and began the cuffing process, asking if she had anything she wanted to leave with Dennis, and at the same time explaining why he could not release the car to Dennis. SX1 at 13:11, approximately.

Trooper Player asks Dennis if he has a licensed driver nearby who can take possession of the car, and Dennis replies "No." SX1 13:52 to 14:14. This causes Harris to ask, either "Can you call somebody to get you?" or "Can he call somebody to get him?" then she added, "Somebody with a driver's license."

Out of camera range, Trooper Player apparently searched Dennis, and asked him if he had anything in his shoes. SX 1 15:07 to 15:18.

Next, Dennis can be seen talking on the phone and Player asks if he is calling his mama to come get him. SX1 at 15:30. He follows that with a question about his mother's location, the answer to which is inaudible, but Player immediately calls for a tow truck and notifies dispatch to "Show me 10-6 on a vehicle search." SX1 at 15:44 and 16:00. He immediately began the search.

He found the Xanax at minute 16:39. About a minute later he asked Dennis how close he lived to their location, and tells Dennis that the car was going to be towed. SX 1 at 17:45.

Player told Harris about adding the possession of Xanax charge to her other ones, and that her car would be towed. SX1 at 19:50, 21:15.

Still searching the car, talking to himself or into the recorder, he says he can still smell weed, and he smells it bad. 22:25.

The tow truck arrived. SX1 at 27.03. Player informed dispatch that Harris was in custody and added possession of a controlled substance to the other charges. SX1 at 28:00-28:11

Dennis left camera range because his ride was there, and Player assured the other officer that he was good to go. SX1 at 29.05. No evidence can be seen or heard on the video that indicates there was a second licensed driver to drive Harris' car away. Harris nevertheless asks again to let someone else take the car. SX 1 at 29:09-29:27. The tow truck driver had already pulled up in front of Harris' car and had apparently begun the preparations for attaching the car to the truck. The trooper concentrated on writing his report rather than explaining it to her again. The tow truck driver entered the car to prepare it for being lifted. SX 1 at 31.30.

# SUMMARY OF THE ARGUMENT

The trooper had two valid reasons to enter the car on the night of Denetra Harris' arrest: He had probable cause to search for evidence of marijuana use because he smelled burnt marijuana at the first contact, and after he decided to impound the car, he was required to inventory it. Her counsel refers to the inventory as an inventory search. The judge correctly ruled that the trooper was authorized to search for evidence of criminal activity and was also required to inventory the car prior to a reasonable impoundment. He gave the defendant a reasonable time to make arrangements. No licensed driver showed up to take care of her car.

The search and inventory overlapped, but the trooper, whom the judge found to be credible, testified that he followed the D. P. S. procedures. He did not begin to search before he decided to impound the car, and he opened all the containers, although he could not recall every container he opened.

The order for Harris to repay a portion of her attorney's fees was a part of her "pretrial" supervision obligations. She had an appointed attorney "in the interests of justice," not because she was indigent. The judge believed that she could, with the help of her live-in boyfriend of seven years, who helped support her, afford the monthly payment.

# ARGUMENT

**I. The search of the vehicle was based on the burnt marijuana that Trooper Player smelled at first contact; the inventory of the vehicle was based on the fact that it was going to be towed.**

### A. Legal Standard

In his first issue, Appellant contends that the inventory of the vehicle violated the law. The United States Supreme Court ruled, in *Gant,* that a search of an automobile's passenger compartment incident to a recent occupant's arrest only if it is reasonable to believe that the arrestee might access the vehicle at the time of the search or that the vehicle contains evidence of the offense of arrest. *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009). Although the Supreme Court in *Arizona v. Gant* rejected the previously acceptable "incident to arrest" reason for a warrantless search of a vehicle, the *Gant* Court nevertheless left intact the exception to the Fourth Amendment warrant requirement set forth in *United States v. Ross,* 456 U.S. 798, 820-821, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982), where, if there is probable cause to believe a vehicle contains evidence of criminal activity, officers are still authorized to search "any area of the vehicle in which the evidence might be found." *Gant*, 556 U.S., 347.

The arresting officer had probable cause to search the vehicle for evidence of a crime, which is an exception to the warrant requirement, even after *Gant*.

If there is probable cause to believe a vehicle contains evidence of criminal activity, *Ross*, 456 U.S., 820-821 authorizes a search of any area of a vehicle in which the evidence might be found.

## A. Application of Law to this Case

There are two different reasons why Trooper Mike Player entered Denetra Harris' car. He had the right to search it to look for evidence of marijuana. 2 RR 27, 43. He had smelled burnt marijuana from the very first contact with Denetra Harris at her car. SX 1; 2 RR 28. Additionally, she had admitted to having ingested marijuana. 2 RR 43. While he was searching the car, looking for marijuana, he had authority to search inside any container which could have contained marijuana. Searching for marijuana, he found the four Xanax pills inside a bottle which had once held an over-the-counter pain reliever. SX1. He continued searching for marijuana even after finding the Xanax.

He also had a second reason to be inside that car. He was required to inventory the car prior to the car's being towed. This inventory was the focus of countless questions at the hearing on the motion to suppress, but it was not the main reason for the search.

Appellant believed that the trooper was using the impound as a pretext to search the car, but the trooper's testimony refuted that.

> Q. You know that when the car gets impounded, you're going to search it, right?
> A. I'm not going to search it. I'm going to inventory its contents.
> Q. That's a search, is it not?

10

A. Inventory and search, two separate things. A search is I'm looking for something specific.

Q. But when you impound a car, you're going to go through every nook and cranny in that car and find out everything that's inside it?

A. I'm going to inventory the contents, sir.

2 RR 23.

Additionally, when Mr. Wharton asked, "Okay. So you start searching the car before an impound is even the decision in the case, before it's even been decided?" The State did not object to the question as based on facts not in evidence, but they might have. A close viewing of the video shows that he made the decision to search from the very beginning and to inventory after determining that the person Dennis had called would not arrive soon enough. He made the decision to impound the car when he asked dispatch to call the tow truck. After the tow truck was on its way, whenever he was asked about it, he replied that the car was being towed. He started searching the vehicle as soon as the tow truck was on its way, and the search gradually became an inventory as he checked with Dennis to allow her to take the money in her purse and agree with his report of the inventory.

When Wharton asked him the question about searching before the decision to impound was made, Trooper Player responded, "There's probable cause on the video, sir, to be in that car well before an impound was ever called." 2 RR 27. When Wharton asked for an explanation, the

11

trooper said, "The odor of burnt marijuana and alcohol beverages is probable cause to search a vehicle." 2 RR 28. Then the Trooper affirmed that probable cause existed even without a warrant. 2 RR 28.

On appeal, Appellant still questions whether the impound was lawful, challenging it by assuming that someone else was available to drive the car away for Ms. Harris. The video, however, shows no such person. The passenger, Dre Dennis, had no license. Appellant argues that Dennis started making phone calls at Harris' request. Appellant's Brief at 6, citing SX1 at 13:50. On being asked by the trooper whether he knew a licensed driver nearby who could come and take possession of the car, Dennis says "no." SX1 at 13:58 to 14:13. The next part of the conversation is out of camera range, and not clearly audible. It is unclear whether Harris asked for Dennis to be able to call someone to take the car or just to pick up Dennis, but she clearly requests someone with a license. SX 1 at approximately14:20. Dennis suggests his mother, and Harris agrees. SX 1 at approximately 14:24. Whoever eventually arrived to pick up Dennis never came into view on camera and no voice can be heard offering to show a license and take the car. The trooper testified that he or she was a lone occupant. Contrary to the defense attorney's assertion about the timing of the decision, Trooper Player had decided the car would have to be towed when Dennis responded to the

12

trooper's question about how far away the mother was. SX 1 at 15:44. That is when he told the dispatcher to send a tow truck—in the fifteenth minute of the video. He told Dennis and Harris separately that the car was being towed. SX 1 at 17:45 and 21.15. The tow truck had arrived and begun setting up when Dennis' ride finally arrived. SX 1 at 27:03 and 29:05.

Ms. Harris repeated her request that someone else be allowed to take her car, but at that point, the tow truck was there and setting up, and no licensed driver ever offered to drive Harris' car away. The presumably licensed driver who picked up Dennis was only one person and could not have driven two cars away. 2 RR 26.

The trooper's offer to allow another licensed driver to take the car was reasonably extended until the time he determined that whoever might be coming was too far away. He was not required to remain there indefinitely to wait. His efforts to accommodate the defendant were reasonable.

## II. The search and inventory were both justified.

A.    **Did the State prove that DPS had a policy and the trooper followed the policy regarding the opening of containers?**
and

B.    **Did the trooper begin the inventory before he decided to impound the car?**

The State finds it difficult to treat these two sub-issues separately, as they are so intertwined.

The State's witness, Trooper Mike Player testified that to the best of his knowledge, he followed D.P. S. policy in conducting the inventory. 2 RR 34. He also said that an inventory is required when a car is impounded. 2 RR 23. He explained that the purpose of an inventory is to identify the contents of the vehicle. 2 RR 24. A secondary purpose is to protect the owner and the department from claims of lost property stolen property, vandalized property, or even if there's something dangerous in the car. 2 RR 24. When asked, "It's not to discover evidence in a case, right?" Player responded, "It's to inventory the contents, sir."

The next questions followed after defense counsel read an excerpt from the D.P.S. policy requiring the person impounding a vehicle to give "prime consideration" to the owner or person in control of the vehicle. 2 RR 25. Player testified that Harris had made it clear that she wanted the car to be released to a licensed driver, not impounded. 2 RR 26. He agreed that he had at first offered to let a licensed driver take the car, if they could have been there within a reasonable time—about fifteen to twenty minutes. Defense counsel asserts that a licensed driver actually showed up to drive the car

away, but the trooper denied this, saying that the driver, a lone occupant, arrived to pick up Dennis, but not to drive Harris' car. 2 RR 26.

When defense counsel accused the trooper of starting to search the car before deciding to impound the car, he was mistaken. The decision to impound the car was made before that—when he called the tow truck—after Trooper Player asked Dennis how far away his mother was. That was at minute 15:44. He immediately told dispatch to call the tow truck and he then began searching the vehicle. The search was based on the smell of burnt marijuana he encountered at first contact. 2 RR 27, 28.

Defense counsel at trial, and again on appeal, continues to blend an inventory and a search by referring to an "inventory search," but in the trooper's mind, they are different procedures, with different purposes. 2 RR 28. He found the pills in a search for which he had probable cause. 2 RR 29.

Player did say it was a search incident to arrest, (2 RR 29), but what he described was really a search for evidence, which is not prohibited by *Gant v. Arizona*. See Legal Standard, in Issue One. See also 2 RR 27-28.

Defense counsel began talking about opening containers near the end of his direct examination of Trooper Player 2 RR 36- 38. Three times he said he opened all the containers in the car. 2 RR 36, 37. He could not name every container he opened. 2 RR 37. Defense Counsel attempted to get

15

Player to say that because he could not quote the D.P.S. policy on opening containers, and because he could not remember what containers were in the car, that he did not know what the policy was. Player said he did know the policy, but could not remember every container in the car. 2 RR 37 – 38. He recalled some items of value she had and said he had noted them on the video, but found nothing illegal after the Xanax. 2 RR 38. The video shows a black bag and a purse. Nothing in the testimony or the video shows a container he did not open.

On cross examination by the State, He twice again stated the inventory was done according to D.P. S. standard inventory procedure. 2 RR 43, 45. That testimony by the experienced trooper was credible and sufficient to convince the trial court. Her ruling should be affirmed.

Defense counsel based a portion of his argument on the false assumption that the trooper first began searching the car before he actually made the decision to impound it. 4 RR 6, 8. From the citations given earlier, one can see that he made the decision to impound the car when he called for a tow truck, which was just before he started his search for evidence of marijuana combined with an inventory.

The prosecutor acknowledged that the search incident to arrest was not the correct term to use in this case. She argued that the inventory was

reasonable as the alternative proffered by Ms. Harris on the night of her arrest was not a reasonable alternative. There was no other licensed driver available to take possession of the car.

The Court's pertinent findings on the motion to suppress include the following:

> While standing at the driver's door, Trooper Player smelled a strong odor of marijuana coming from the interior of the vehicle. He also smelled an odor of an alcoholic beverage emitting from the defendant, the driver of the vehicle. The defendant admitted, during the investigation, the odor of marijuana was loud and admitted she had consumed alcohol earlier.
> . . . .
> The trooper was advised that the defendant had outstanding warrants approximately 12 and-a-half minutes after the video began.

2 RR 13.

> The evidence before the State does not show that the defendant nor the passenger responded or suggested that they had a [licensed driver]. The trooper calls for a wrecker. The officer inventoried the vehicle after calling for the wrecker, finding Xanax in an Advil bottle. The wrecker arrived on the scene 27 minutes after the video began, State's Exhibit No. 1. At this time, no one had arrived on the scene suggesting they could drive the vehicle. At this time, the defendant had not indicated to the trooper that she knew of anyone with a license that could drive the vehicle.
> A couple of minutes after the wrecker arrived and after the inventory had been conducted, the defendant did ask to let someone take her car so she wouldn't have to pay an impound fee, but the facts before the Court at no time suggest that anyone was actually named or suggested that they would actually be coming to take the vehicle. The facts in evidence before the Court indicate that neither passenger or driver ever advised Trooper Player that anyone was on their way or available to take possession of the car with a license.

2 RR 14.

> I find that the arrest of the defendant for outstanding warrants was lawful. I find that the inventory of defendant's vehicle, prior to releasing the vehicle to the wrecker service, was in accordance with D.P.S. policy and was reasonable under all the circumstances of this case. Additionally, I conclude that the strong odor of marijuana that was emitting from the interior of the car also provided probable cause for the trooper to search the vehicle.

2 RR 15.

Because the evidence showed and the Court ruled that Trooper Player had not one, but two valid reasons to enter the car, the judge did not suppress the evidence he found there. The ruling was correctly based on the evidence from the video and the credible testimony from Trooper Player. This Court should find that she did not abuse her discretion in denying the motion to suppress.

**III. It was not an abuse of discretion to order defendant to pay $40 per month for her court-appointed appellate attorney.**

The judge issued an order placing Harris on pre-trial services on August 27, 2014. CR 51. In that document, she ordered Harris to pay $40 per month to help defray the costs of her appellate attorney's fee. She had previously been ordered to pay $25 per month during the pendency of her trial for her trial attorney, but had not been keeping up with that or with her supervisory fees; she was $47 dollars behind on attorney's fees at her sentencing hearing. 5 RR 9. The judge also ordered conditions of appellate bond on a separate sheet, in which she referenced the meeting the

obligations of pretrial supervision. CR. 57-59. She also appointed Mr. Wharton to process the appeal on the same day. In the order appointing him, there is a choice for the judge to indicate whether she is appointing him because Harris is indigent or in the interest of justice. "Interest of justice" is marked, not because the defendant is indigent. CR 52.

### B. This issue alleging an abuse of discretion in ordering attorney-fee payments has never been brought to the attention of the court, and therefore was not preserved.

This issue has not been brought before the trial court. Consequently, it was not preserved. A more appropriate remedy would have been a motion to amend the bond conditions, which could have been made at any time she was out on bond. If the trial court had been given an opportunity to address the issue, she might have reconsidered. The appellant filed a motion for a free appellate record on September 19, 2014. CR 67-69.[1] In it she does not mention her ability to pay attorney's fees. In fact, her September 19, 2014, affidavit says that "My boyfriend supports me, and my family has helped me

---

[1] The undersigned attorney has diligently looked for a place in either the clerk's record or the reporter's record where the judge actually ordered Harris to pay for the record, and has not found it. There is a motion for a free record, but I can find no order setting hearing on it and no written order granting or denying it. The record has nevertheless been prepared, and there are blanks--not filled in on my copy—saying how much the record costs to prepare, and who has been or will be ordered to pay for it.

pay for my bond and the other financial obligations involved in this case."

CR 69.

## C. The Code of Criminal Procedure allows a court to make payments intended to offset in part, the cost to the county for attorney's fees.

The trial court is allowed, under certain circumstances, to order the defendant to pay something toward the attorney's fees during the pendency of the case.

> If the court determines that a defendant has financial resources that enable him to offset in part or in whole the costs of the legal services provided, including any expenses and costs, the court shall order the defendant to pay during the pendency of the charges or, if convicted, as court costs the amount that it finds the defendant is able to pay.

Tex. Crim. Proc. Code Ann. art. 26.05(g) (Vernon) (Vernon).

Appellant's cases are distinguishable; none deal with attorney's fees as a condition of pretrial supervision.

The *Valenciano* and *Speth* cases, cited by Appellant's brief at page 17, are not really on point. In *Valenciano,* the condition was that required the appellant to stay from his family during the appeal, and in *Speth*, the trial court prohibited appellant from working as a chiropractor during the appeal. Neither of these was reasonable, according to the *Speth* opinion. *Speth v. State*, 939 S.W.2d 769, 771 (Tex. App.—Houston [14th Dist.] 1997, no pet.), *disapproved of by Ex parte Anderer*, 61 S.W.3d 398 (Tex. Crim. App.

2001), *disapproved of by Ex parte Ex parte Anderer*, 61 S.W.3d 398 (Tex. Crim. App. 2001).

"In *Easton*, the court found that an appeal bond condition requiring appellant to pay $ 44.50 in court costs was an abuse of discretion because it had nothing to do with securing appellant's appearance in court." . This holding is distinguishable because court costs are not imposed until after a conviction is final. The costs imposed here are to offset some of the costs of the appeal, and they are payable during the pendency of the appeal, quite different from court costs, which have nothing at all to do with securing appellant's appearance during the appeal.

Unlike the cases mentioned above, paying for one's own attorney is a way to keep the client invested in her appeal and in contact with her pretrial supervisor and will encourage her to appear.

Appellant's Issue III should be resolved in favor of the State.

**IV. Denetra Harris was not presumed indigent at the time she requested the Court to pay for appellate counsel and the reporter's record.**

Appellant asserts as Issue IV that the State failed to rebut the presumption that Harris is indigent and should not have to pay attorney's fees. Was it the state's burden?

The defendant bears the initial burden when claiming indigence, once the defendant meets the burden of production, the burden shifts to the State to produce evidence that the defendant is not indigent See *Snoke v. State*, 780 S.W.2d 210, 213 (Tex. Crim. App. 1989); *Ramadan v. State*, 89 S.W.3d 744, 746 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

Once the State has produced evidence of the defendant's assets that would show non-indigence, the defendant may need to present rebutting evidence. One defendant argued insufficient evidence of the trial court's finding of non-indigence because the State had failed to present evidence that the antiques in question could be sold or whether the defendant owned them. *McFatridge v. State,* 309 S.W.3d 1, 8 (Tex. Crim. App. 2010). The Court of Criminal Appeals held that the issue should have been settled at the trial level; the defendant had the burden to present additional, supporting evidence at the indigence hearing. *Id.*

This Court has adopted a two-step process to guide courts in making indigency determinations for purposes of a free record for appeal. First, the defendant must make a prima facie showing of indigency. n18 Once the defendant satisfies this initial burden of production, the burden then shifts to the State to show that the defendant is not, in fact, indigent. n19 This means, essentially, that unless there is some basis in the record to find the defendant's prima facie showing to be inaccurate or untrue, the trial court should accept it as sufficient to find him indigent. After a defendant establishes a prima facie showing of indigency, "an appellate court can uphold a trial court's determination of non-indigence only if the record contains evidence supporting such a determination." n21 In Whitehead, we recognized that the two-step process outlined above also applies when determining whether a person is indigent for purposes of appointed counsel. A reviewing court should uphold a trial court's ruling denying indigent status only if it finds that the trial court, having utilized this two-step process, "reasonably" believed the defendant was not indigent.

*McFatridge*, 309 S.W.3d at 6(internal references to footnoted citations omitted.)

**Standard of Review**

A defendant claiming indigence in order to have appellate counsel appointed must show that he is "not financially able to employ counsel." n11 Tex. Crim. Proc. Code Ann. art. 1.051(b) (Vernon). A defendant claiming indigence in order to get a free copy of the record must show that he is not able to "pay or give security for the appellate record." TEX. R. APP. P. 20.2. A trial court makes a ruling when the issue is raised on a case-by-case basis. *Whitehead v. State,* 130 S.W.3d 866, 874 (Tex. Crim. App. 2004) (quoting

23

*Gray v. Robinson*, 744 S.W.2d 604, 607 (Tex. Crim. App. 1988)). There are two separate questions to answer, but the answers will be based on the same elements. See *Whitehead*, 130 S.W.3d at 878. It is possible for a trial court to appoint counsel, but make the defendant pay for the record, or vice versa. *Id.* Factors to consider in both decisions are these: "the defendant's income, source of income, assets, property owned, outstanding obligations, necessary expenses, the number and ages of dependents, and spousal income that is available to the defendant." Tex. Crim. Proc. Code Ann. art. 26.04(m) (Vernon). Each county should develop guidelines that it uses to determine whether a defendant is indigent for purposes of appointing counsel. Tex. Crim. Proc. Code Ann. art. 26.04(l). *McFatridge*, 309 S.W.3d at 5-6.

**Application.**

Appellate counsel bases his argument for indigence on a false premise: "Ms. Harris has been indigent throughout the course of the case. She was initially appointed a lawyer by the court for that reason." Appellant's Brief at 19. He cites the court to page 16 of the Clerk's Record, which does not show indigence. In the order appointing counsel at the bottom of the page, where the judge chooses to base the appointment on either indigence or the interest of judgment, she selected "the interests of justice." CR 16.

Additionally, the Court mentioned at the beginning of the Hearing on Bond and Indigency that she had not held a prior hearing on indigence. 5 RR 6. There was therefore no presumption of continued indigence as Appellant claims.

The State put on evidence that Randy Williams paid her bills. She testified that he helped her with rent, utilities, clothing and food. 5 RR 26. She also stated she received financial aid as a student, which allowed her the discretion to allot to meet her needs, including legal fees, perhaps. 5 RR 25-27. During the judge's inquiry, Harris stated she and Williams had a relationship that had lasted approximately seven years.

The judge signed the order appointing appellate counsel, again declining to select indigence as a reason. CR 52. After the judgment, Harris filed a post-judgment motion for a free record. In the attached affidavit, as mentioned before, she swore "My boyfriend supports me, and my family has helped me pay for my bond and the other financial obligations involved in this case." CR 69. Attorney's fees, or at least a part of them, are a part of the "other financial obligations involved in this case" and her family will help her with these, or she will get a job, or she will use her financial aid money to pay.

This Court should resolve this issue in favor of the State and affirm the trial court's rulings.

## PRAYER

For the foregoing reasons, there is no reversible error, and the State prays that the sentence be affirmed in all respects.

Respectfully Submitted,

/s/*Zan Colson Brown*
Zan Colson Brown
Texas Bar No. 03205900
Assistant Criminal District Attorney
101 East Methvin St., Suite 333
Longview, TX  75601
Telephone: (903) 236–8440
Facsimile:  (903) 236–3701

# CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing has been forwarded to all counsel of record by certified mail, return receipt requested and/or facsimile to:

Mr. Jonathan Wharton
SNOW E. BUSH, JR., P.C.
Texas Bar No: 24075764
420 N. Center Street
Longview, TX 75601
Email: jonathanwharton1@sbcglobal.net

this 22nd day of January, 2015.

/s/ *Zan Colson Brown*
Zan Colson Brown
Assistant Criminal District Attorney

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing document complies with Texas Rules of Appellate Procedure, Rule 9 (2014) regarding length of documents, in that exclusive of caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix, it consists of 5,070 words.

/s/*Zan Colson Brown*

Zan Colson Brown
Assistant Criminal District Attorney